*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CAMERON MICHAEL GALEY,

        Defendant-Appellant.

UNPUBLISHED
August 06, 2026
10:37 AM

No. 374362
Livingston Circuit Court
LC No. 2023-028048-FH

Before: GADOLA, C.J., and RIORDAN and SWARTZLE, JJ.

PER CURIAM.

Defendant, Cameron Michael Galey, was convicted after a jury trial of two counts of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(b), and sentenced to serve concurrent terms of 6 to 15 years in prison. Defendant appeals as of right, challenging his convictions. We vacate defendant's convictions and sentences and remand to the trial court.

## I. FACTS

The complainant, Reagan Marhofer, and defendant met on the dating app Tinder in June 2022; both Marhofer and defendant were 18 years old at that time. Soon after they met on Tinder, they moved their conversations to the messaging app Snapchat and then met in person. According to Marhofer, on the second date the couple engaged in oral sex. On July 1, 2022, Marhofer moved out of her parents' home after she and her parents "decided that . . . it was best if [she] moved out of their house and find an apartment." On July 2, 2022, the couple went on their third date and agreed that they would date each other exclusively. On July 4, 2023, Marhofer moved into an apartment located in the basement of her grandparents' home. Thereafter, the couple began seeing each other a few times each week and regularly having sexual intercourse. In November 2022, defendant moved into Marhofer's apartment. About this same time, Marhofer's father offered defendant a job with the company where Marhofer's father worked. Defendant quit his previous job and accepted the job; Marhofer's father became defendant's supervisor at work.

-1-

According to Marhofer, initially the couple had an enjoyable sex life together.[1] She testified that the couple enjoyed "rough" sex, which she testified included "faster pace, pulling of the hair occasionally, sometimes he'd smack my butt," which sometimes left marks. After defendant moved into her apartment, Marhofer began experiencing lower abdominal pain during sexual intercourse. Marhofer testified that she had an IUD birth control device implanted that may have been the source of the pain during intercourse. Defendant similarly testified that Marhofer told him she believed that the IUD was the source of the pain.

According to Marhofer, when she experienced pain during intercourse, she would ask defendant to slow down or stop, but he would not do so. She testified that sometimes he would hold her down until he finished, sometimes leaving bruises on her collarbone or her arms or legs. She testified that afterwards, he would apologize and agree to listen to her in the future during sex. By contrast, defendant testified that when Marhofer would complain about pain during sex, he would accommodate her however she requested, such as switching positions.

Marhofer testified that as their relationship continued and the pain during intercourse continued, she became less interested in sexual relations with defendant. Marhofer admitted, however, that in December 2022, she gave defendant a duration spray for the purpose of increasing the amount of time he could perform intercourse. She also testified that from December 26, 2022, through January 3, 2023, defendant was vacationing with his father, and that during that time she missed him and communicated with him as much as possible through Snapchat.

Marhofer testified that on certain occasions she told defendant that she did not want to have sex but that he forced her to participate. She described an instance in their kitchen in January 2023 when defendant wanted to have sex. Marhofer testified that she told him no, but he pushed her over the kitchen counter, held her down, and engaged in penile/vaginal intercourse with her. She testified that another time, defendant asked her to perform oral sex on him; when she refused, he forced his penis into her mouth. She testified that another time when the couple was in their bedroom, defendant wanted to have sex. When Marhofer told him no, defendant took her pants off and forced his penis into her vagina. Marhofer testified during these events she never raised her voice loudly enough for her grandparents to hear because she was afraid of defendant.

On February 14, 2023, the couple decided that they would celebrate Valentine's Day in a rented hotel room. When they arrived at the hotel room, defendant surprised Marhofer with flowers and candy. He then took a shower and when he came out of the shower Marhofer was in bed wearing the lingerie that the couple had picked out together; she testified that they were planning to have sex. During intercourse, however, Marhofer told defendant she was beginning to feel pain; defendant testified that they therefore stopped and decided to switch positions, then continued with intercourse. Defendant testified that afterwards, the couple watched a movie and ate, and there were no arguments or disagreements. The next morning, they got up and went to work. By contrast, Marhofer testified that at the hotel defendant continued with sexual intercourse

---

[1] Marhofer initially testified that the couple had sex approximately three or four times a day if they were together, though she later stated that they had sex three to four times each week. Defendant testified that the couple had sex multiple times each day.

though she told him she was in pain and was crying; she testified that she had not cried during any of the previous instances of nonconsensual sex.

In January 2023, Marhofer was hired by the same company where her father and defendant were employed. On February 16, 2023, Marhofer's father fired defendant at work in front of Marhofer for using the company credit card to buy gas for personal use. Marhofer testified that defendant was embarrassed and angry about being fired by Marhofer's father and that this event caused a significant problem in her relationship with defendant. She also testified that shortly before this occurred, her father had encouraged her to break off her relationship with defendant, but that she had no intention of doing so despite her father's advice.

On February 21, 2023, defendant broke off the relationship with Marhofer and moved out of the apartment. When she arrived home from work that day, defendant was packing. According to defendant, Marhofer became distraught and begged him to stay. On February 26, 2023, Marhofer texted defendant, which led to a phone conversation during which the couple agreed to meet to try to repair their relationship. Marhofer testified that in the text conversation, she told defendant that she loved him, that she wanted to start a family with him, that she wanted them to work through their problems, and that it "killed her" that he did not feel the same way.

Marhofer testified that she had no qualms about meeting with defendant despite her assertions that he forced her to have sex on several occasions. She also testified that when they met to discuss the relationship, the couple did not discuss sex despite her later assertions that he had been sexually assaulting her for months. She testified that she left the conversation believing that they were going to be friends and perhaps repair the relationship.

Later that day, Marhofer called defendant and told him that she no longer wanted a romantic relationship with him. According to Marhofer, defendant had become angry when he could not reach her by telephone and the ensuing quarrel caused her to end the relationship. She testified that defendant then texted her and stated that he no longer wished to see her. The next day, February 28, 2023, Marhofer went to the police station and reported that instances of nonconsensual sex had occurred during the couple's relationship. Marhofer testified that her father had urged her to make the police report after she disclosed to him the details of her relationship with defendant and that she had not wanted to contact the police.

Defendant was charged with three counts of CSC-III. Before trial, defendant filed an exhibit list identifying as proposed exhibits certain text messages between Marhofer and defendant, including text messages in which Marhofer expressed her satisfaction with the couple's sexual activity and the relationship in general. The prosecution filed an emergency objection to defendant's exhibit list, arguing that the text messages should be excluded as hearsay and also on the basis of relevancy, prejudice, and the cumulative nature of the texts. Defendant responded to the objection arguing that "there are several hearsay exceptions within MRE 803 that are applicable in this case" and also arguing that the text messages were relevant under MRE 401 and 402. At the hearing on the objection, the prosecutor and defense counsel informed the trial court that they agreed that defense counsel would not admit the text messages except to refresh recollection or to impeach. The trial court agreed to review the matter again and scheduled a hearing before trial to do so.

During cross-examination of Marhofer during trial, defense counsel asked Marhofer about her statements to defendant in her text messages of February 26, 2023. The prosecution objected on the basis of hearsay, and the trial court excused the jury to resolve the prosecution's objection, which first had been raised by the prosecution's pretrial objection. The following discussion took place:

*The Prosecutor*:     Your Honor, my objection is hearsay. As we discussed in our conference in the jury room, I said I would leave . . . the defense to attempt to lay their foundation as to exceptions. There has been no obvious foundation for any exception that has been laid. The victim has not denied making these statements, so there is no need to refresh her with them or to admit them for impeachment purposes.

*The Court*:     [Defense Counsel], your response?

*Defense Counsel*:     Judge, we had this conversation previously. I've gone so far as to amend the exhibit list, I've gone so far as today to provide it with [defendant's] . . . responses to her text messages redacted. I've never been put in a position where I have somebody's own written statement that they've admitted to, that they are not denying at all, not be allowed to be used at trial. [It's] her own statements. She's not denying them. . . . And she is discussing in detail her relationship with the Defendant. I can refresh her recollection with it, it can be introduced based on her testimony as a prior inconsistent statement, but they are in fact her own statements.

* * *

*The Court*:     This Court has before it . . . Defendant's proposed Exhibits A and B. The Court finds that the exhibits themselves are hearsay, and they are excluded for being irrelevant, and the risk of undue prejudice substantially outweighs the probative value. That does not prevent [defense counsel] from asking the complainant in this case whether or not she made such a statement, but the evidence contained in Exhibits A and B will not be admitted. Anything further . . .?

*The Prosecutor*:     Judge, I – I would continue to object to the contents of the statement and asking her about statements she made – out-of-court statements without laying a foundation for an exception to 801. They are hearsay.

*The Court*:     Let me be clear. He's not going to be asking her any specific questions related to the text messages in A and B. He can

-4-

ask her questions in general, did she make certain statements about their relationship and things of that nature, but to point directly to this text message on such a certain date, that is hearsay, and there's no exception to the same. Are we clear, [defense counsel]?

*Defense Counsel*: Judge, I – I just want to make sure – I can ask her about the content of what was said that day, is that --

*The Court*: You're not going to be asking her any question regarding the text messages; in particular that were a part of Exhibit A and Exhibit B. You can ask her general questions about statements, but did you send a text message to [defendant] specifically about A, B, C, or D, no, that's excluded as hearsay.

*Defense Counsel*: But depending on her testimony, it can still be brought in, depending on how she [testifies] under a hearsay exception.

*The Court*: You can attempt to refresh her memory, if you wish, . . . but the statements themselves are hearsay, and the risk of prejudice substantially outweighs the probative value of the same for them to be admitted.

Defense counsel then cross-examined Marhofer using some of the text messages contained in the exhibits to refresh her memory regarding her text messages to defendant on February 26, 2023. The texts themselves were not admitted and much of the information was not presented.

During cross-examination, Marhofer agreed that when she talked to police on February 28, 2023, she was unable to identify any specific instances of nonconsensual sex with defendant, even though one of the dates alleged at trial, February 14, 2023, had occurred just two weeks earlier. Marhofer also admitted that she and defendant had consensual sex on February 21, 2023, the day he moved out of her apartment, but told the police on February 28, 2023, that at the end of the relationship she and defendant no longer were having consensual sex.

Detective Sergeant Joseph VanderMeulen with the Michigan State Police testified that defendant agreed to talk to the police and came to the police station willingly. When the officer asked defendant if he had ever had nonconsensual sex with Marhofer, defendant said no. VanderMeulen testified that after he questioned defendant further, defendant agreed that sometimes Marhofer would ask him to stop during sex and that the couple then would reposition and that sometimes there was miscommunication between defendant and Marhofer while having sex.

Defendant testified and denied that he ever engaged in sexual penetration of Marhofer without her consent. Defendant described that the couple initially had a wonderful relationship and eventually he moved into her apartment in November 2022. About the same time, Marhofer's father arranged for defendant to be hired at the company where the father worked. Not long after, Marhofer also was hired at the same company. Defendant testified that he and Marhofer each

began working long hours and were often exhausted after work. They had also gotten a dog, which added more duties at home. He testified that during this time the couple quarreled. He also testified that sometimes Marhofer would complain of pain during sex, which Marhofer attributed to her IUD. He testified that when Marhofer stated she was in pain during sex, they would stop and reposition, and whenever she wanted to stop entirely, he did so. Defendant also denied that he ever forced Marhofer to have sex, specifically denying the instances Marhofer had described as instances when he forced her to engage in sexual penetration.

During deliberations, the jury requested to view the text messages between Marhofer and defendant, which the trial court denied. At the conclusion of trial, defendant was convicted of two counts of CSC-III. The jury was deadlocked regarding the third count of CSC-III, which was thereafter dismissed. Defendant was sentenced to serve two concurrent terms of 6 to 15 years in prison. Defendant now appeals.

## II. ANALYSIS

Defendant contends that the trial court erred by excluding from evidence Marhofer's text messages to defendant, sent contemporaneously with the alleged criminal sexual conduct, in which Marhofer expressed great satisfaction with the couple's sexual activity. Defendant argues that the text messages were admissible under MRE 803(3) as a statement of Marhofer's then mental, emotional, or physical condition. We agree.

We observe initially that this issue is preserved for review on appeal. The prosecution argues that the issue is not preserved because defendant did not specifically identify MRE 803(3) as his proposed basis for the admission of the text messages. However, the often-stated proposition regarding issue preservation is that generally, "[t]o preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019).

Here, *the prosecution* opposed the admission of evidence by defendant. In his exhibit list submitted before trial, defendant identified Marhofer's text messages that he sought to introduce into evidence at trial. The prosecution filed an emergency motion objecting to the admission of the messages. At trial, the prosecution again objected to defendant admitting the text messages, arguing that the evidence was inadmissible hearsay and that the potential prejudice of the evidence outweighed its probative value. Because defendant was not the party objecting to the admission of evidence at trial but instead was responding to an objection raised by the prosecution, defendant's argument before the trial court was made within the framework established by the prosecution's objection. Defendant responded by arguing that several hearsay exceptions in MRE 803 applied in this case, and that the evidence also was admissible under MRE 401 and 402. We conclude that the prosecution's objection based on hearsay and undue prejudice and defendant's response that the evidence fell within an exception of MRE 803 and also was admissible under MRE 401 and 402 adequately preserved for this Court's review the question whether the text messages were properly excluded by the trial court on those bases.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Thorpe*, 504 Mich at 251. A trial court abuses its discretion when its decision falls outside the range of principled outcomes. *Id*. at 251-252. A trial court also abuses its discretion when it errs

as a matter of law regarding the admissibility of evidence. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). We review de novo questions of law regarding the admission of evidence, such as whether the admission of evidence is precluded by a rule of evidence. *Id*. We also review de novo the interpretation and application of a statute. *People v Comer*, 500 Mich 278, 287; 901 NW2d 553 (2017).

When this Court finds an error regarding the admission of evidence, a preserved nonconstitutional error "is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative – i.e., that it undermined the reliability of the verdict." *Denson*, 500 Mich at 396. "[T]he effect of the error is evaluated by assessing it in the context of the untainted evidence to determine whether it is more probable than not that a different outcome would have resulted without the error." *Id*., quoting *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999).

Defendant was charged with three counts of third-degree criminal sexual conduct under MCL 750.520d(1)(b). To convict a defendant under that statutory section, the prosecution must establish that the defendant engaged in "sexual penetration with another person and . . . [force] or coercion [was] used to accomplish the sexual penetration." *People v Green*, 313 Mich App 526, 537-538; 884 NW2d 838 (2015). Here, the evidence is undisputed that Marhofer and defendant were in a romantic relationship for several months and during that time they regularly engaged in consensual sexual penetration, including having consensual sexual penetration on the day defendant moved out of Marhofer's apartment. Marhofer testified that sometimes the couple enjoyed engaging in "rough" consensual sex.

The day after the relationship ended, Marhofer reported to police that during the relationship, she sometimes consented to sexual penetration but withdrew consent during the sexual penetration by stating that she was in pain. She reported that sometimes when this happened, defendant did not cease the sexual penetration immediately. Marhofer alleged that one of the times that she withdrew consent during penetration was February 14, 2023, and that on that occasion defendant did not cease the sexual penetration. She also reported to police that on three occasions during the relationship, she indicated to defendant she did not want to have sex but that he nonetheless persisted in sexual penetration. That sexual penetration between Marhofer and defendant occurred repeatedly is not at issue in this case; rather, the only issue is whether on the occasions in question defendant used force or coercion to accomplish the sexual penetration.

The testimony of a victim may be sufficient to establish criminal sexual conduct without corroboration. MCL 750.520h; *People v Hoskins*, 342 Mich App 194, 209 n 8; 993 NW2d 48 (2022). In this case, the primary evidence introduced to prove the charges was Marhofer's testimony that on three occasions she did not give consent to defendant before sexual penetration. Marhofer also testified generally that there were other times, mostly unspecified, that she withdrew consent during sexual penetration, but that defendant continued the sexual penetration.

Defendant sought to refute Marhofer's statements by introducing Marhofer's text messages to defendant that occurred during the same time frame during which Marhofer also claimed the repeated sexual assaults were occurring. In the text messages, Marhofer repeatedly expresses her love for defendant and her eagerness to engage in sex with defendant. Included in defendant's exhibit list were the following text messages from Marhofer to defendant:

Omg I forgot to put in my little book of feelings that you are the finest man on planet earth. Like you make me f\*\*king wetter than the goddamn ocean bc you're just so sexy but you also make me like f\*\*king melt because you're so cute and other times I either just sit and stare at you because you're just such [sic] pretty or I am so overwhelmed by the way that you make me feel and I'm like fighting attacking you with love. Also the dick could never be replaced. Like I never want another dick, we have the best sex and I will never be happier with my sex [life] than I am with ours. You're basically just the perfect human being and I really don't deserve you but somehow you chose me. I'm so happy you did though because I have never been happier.

On January 1, 2023, while defendant was on vacation with his father, Marhofer texted to defendant, in pertinent part:

I cannot imagine life without you at this point and I never want that fear to become a reality. I am 110% yours Cameron, I am quite literally obsessed with you in every way. I'm so incredibly excited to finally f\*\*king see you again because it has absolutely killed me not being with you.

On January 2, 20223, Marhofer texted to defendant:

I will always be standing next to you helping you. I desperately want to work on making our relationship stronger. I'm asking you to just take the last little bit that we're apart and think about how you're feeling and things you need or need changed. . . . All I want in life at this point is to become successful with you, have a family, and eventually grow old and retire with you. I love you in a way that I have never loved another human being. From the moment I met you I could just tell something was different. . . .

Before trial, the parties resolved that defendant would be permitted to introduce the text messages to refresh Marhofer's memory and to impeach Marhofer. During trial, however, upon renewed objection by the prosecutor, the trial court refused to allow the text messages to be admitted on the basis that the text messages were inadmissible hearsay and were more prejudicial than probative.

Generally, relevant evidence is admissible at trial. MRE 402. Relevant evidence is evidence having "any tendency to make a fact more or less probable than it would be without the evidence" when the fact is "of consequence in determining the action." MRE 401. However, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." MRE 403.

Hearsay is defined as a statement that "the declarant does not make while testifying at the current trial or hearing," and that "a party offers in evidence to prove the truth of the matter asserted in the statement." MRE 801(c). Hearsay is not admissible unless it falls within an exception to the hearsay rule. MRE 802; *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010). One exception to the hearsay rule is found in MRE 803(3), which provides in relevant part:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

* * *

(3) A statement of the declarant's then-existing state of mind or emotional, sensory, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity, or terms of declarant's will.

"It is well accepted that evidence that demonstrates an individual's state of mind will not be precluded by the hearsay rule." *People v Fisher*, 449 Mich 441, 449-451; 537 NW2d 577 (1995) (Statements that show marital discord are admissible). Statements of mental, emotional, and physical condition generally are admissible as an exception to the hearsay rule because of their special reliability provided by the spontaneous quality of a declaration describing a condition existing at that time. *People v Moorer*, 262 Mich App 64, 68-69; 683 NW2d 736 (2004).

In this case, considering the nature of the allegations against defendant, the nature of the text messages sent by Marhofer to defendant during the time frame that the charged conduct was alleged to have occurred, and the purpose for the proposed admission of the evidence, i.e., showing Marhofer's then-existing state of mind, the text messages fall squarely within the hearsay exception of MRE 803(3). We therefore conclude that the trial court erred when it found the text messages were inadmissible hearsay.[2]

We also conclude that the probative value of the text messages was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence. MRE 403. "All evidence offered by the parties is 'prejudicial' to some extent, but the fear of prejudice does not generally render the evidence inadmissible. It is only when the value is *substantially outweighed* by the danger of unfair prejudice that evidence is excluded." *People v Mills*, 450 Mich 61, 75; 537 NW2d 909 (1995). The major function of the evidentiary rule allowing the exclusion of evidence on the basis of prejudice is "excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect . . . . It is not designed to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none." *Id*. (quotation marks and citation omitted).

In this case, the text messages were highly probative of the central issue of the case, which is whether defendant used force or coercion to engage in sexual penetration of Marhofer. Marhofer's text messages that "we have the best sex and I will never be happier with my sex life

---

[2] Having determined that the trial court erred by concluding that the text messages were inadmissible hearsay, it is unnecessary for this Court to address defendant's assertion on appeal that defense counsel at trial was ineffective for not specifying MRE 803(3) as the basis for the admission of the evidence.

than I am with ours," that she is passionately in love with defendant, that she wants to marry defendant, have children with defendant, and grow old with defendant, refute the primary evidence offered by the prosecution, being Marhofer's testimony that during the relationship she was frequently forced or coerced by defendant to have sex without her consent. Because the trial court erred as a matter of law, the trial court abused its discretion by suppressing the text messages.

We also conclude that the error in suppressing Marhofer's text messages more probably than not was outcome determinative and undermines the reliability of the verdict. See *Denson*, 500 Mich at 396. Again, the primary evidence against defendant were Marhofer's statements after the fact that she had not consented to certain instances of sexual penetration during the relationship. The text messages indicate that during that time period her state of mind was that of extreme satisfaction with the couple's sexual activity and their relationship as a whole, which stand in stark contrast to Marhofer's allegations, made the day after the couple ended the relationship, that defendant repeatedly sexually assaulted her.

We also note that during deliberations, the jury requested to see Marhofer's text messages to defendant, a request which the trial court denied because the text messages were not in evidence, suggesting that the jury would have considered the content of the text messages had they not been excluded. A review of the record also reveals that at the end of the first day of jury deliberations, the jury reported that after several hours of deliberation, they were deadlocked. The next morning, the trial court read to the jury additional instructions regarding deadlock and directed them to deliberate further. The jury eventually reported back that they had reached a verdict on two counts but remained deadlocked on the third count. While the verdict was being read, a person in the courtroom, later identified as defendant's father, called out "Read the texts." The trial court had the speaker removed from the courtroom, then polled the jury. Juror number nine informed the trial court that the verdict no longer reflected her vote on one of the counts. Upon further inquiry by the trial court, the juror stated that the statement by the person in the courtroom that the jury should read the texts influenced her decision to withdraw her vote. The trial court directed the jury to deliberate further. The jury later returned a verdict of guilty on two counts while remaining deadlocked on the third count. Evaluating the error in the context of the record, it is more probable than not that the trial would have resulted in a different outcome had the trial court not erroneously excluded the text messages.

Defendant's convictions and sentences are vacated and the matter is remanded to the trial court. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Michael J. Riordan
/s/ Brock A. Swartzle

-10-